UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
MALCOLM HAYES,

               Plaintiff,

      - against -

CABLEVISION SYSTEMS NEW YORK CITY
CORPORATION,

              Defendant.
----------------------------------------------------------X

**<u>MEMORANDUM AND ORDER</u>**
07-CV-2438 (RRM)

ROSLYNN R. MAUSKOPF, United States District Judge.

       Plaintiff Malcolm Hayes ("plaintiff" or "Hayes") filed this action against Cablevision

Systems New York City Corporation ("defendant" or "Cablevision"), for discrimination and

retaliation pursuant to 42 U.S.C. § 1981.  Plaintiff claims that defendant terminated his

employment because he is African American, and because he complained about discriminatory

treatment.  Presently before the Court is defendant's motion for summary judgment pursuant to

Fed. R. Civ. P. 56(c).  For the reasons set forth below, defendant's motion is GRANTED.

**BACKGROUND**[1]

       Plaintiff, who self-identifies as African American, began employment with Cablevision

as a technician in 1995, and in 2005 was promoted to the position of Field Service Supervisor.

(Def. Rule 56.1 Statement (Doc. No. 82) ¶¶ 3, 5.)  In January of 2006, plaintiff received his first

annual evaluation as a supervisor, in which his performance was rated as satisfactory.  (*Id.* ¶¶ 18-

19.)  In September 2006, Robert Weismann ("Weismann"), a Cablevision "Area Operations

Manager" ("AOM") and plaintiff's immediate supervisor at the time, indicated in an email to all

---

[1] The following material facts are taken primarily from the Local Rule 56.1 statements submitted by the parties and
the affidavits and exhibits submitted in connection with the parties' motions for summary judgment and opposition
thereto. The facts are undisputed except as noted.

Field Service Supervisors that plaintiff had not completed his performance reviews of the subordinate technicians who reported to plaintiff.  Also in September, plaintiff was disciplined for an altercation with a subordinate, Alremi Walcott, during which plaintiff told Walcott "I'm sick of you f***ing me around."  (*Id.* ¶¶ 21, 27-31.)   In December 2006, Weismann prepared plaintiff's annual evaluation.  (*Id.* ¶¶ 35-36, 42.)

Plaintiff received unsatisfactory scores in this evaluation.  Weismann gave Hayes a score of "2" ("Partially Achieved Expected Performance") in three of the nine categories in the 2006 evaluation.  (Weismann Decl. (Doc. No. 84) ¶ 20, Ex. C.)  Under the category "Plans Effectively," Weismann stated that plaintiff "[fell] short in his planning to ensure reviews are completed on time" and "continued to miss review dates throughout the year."  (*Id.* ¶ 22, Ex. C.) Under the category "Makes Results Happen," Weismann stated that plaintiff's "results fail to meet expectation.  His record in completing monthly task assignments . . . was poor" and that despite being advised of the need for improvement, plaintiff's "performance only improved marginally."  (*Id.* ¶ 23, Ex. C.)  Under the category "Supports Company Values and Policies," Weismann stated that plaintiff  "enforces attendance adherence with his technicians [and] is known to be trustworthy and reliable," but cited plaintiff's altercation with Walcott and stated that plaintiff "does need to improve when he is involved with a confrontational situation."  (*Id.* ¶ 24, Ex. C.)  Hayes' overall rating was 2.67 out of 5, which was below Cablevision's standard of 3.  (*Id.* ¶¶ 25, 27.)

As a result of these failing, Hayes was placed on a "Performance Improvement Plan" ("PIP").  (*Id.* ¶¶ 42, 45.)  Cablevision's policy was to place employees on a "Performance Improvement Plan" ("PIP") when they received an overall rating below a "3" on an annual evaluation.  (*Id.* ¶ 27.)  A PIP is a 90-day review period during which employees are expected to

comply with the goals and objectives outlined in the previous annual evaluation, with bi-weekly

review by a supervisor.  (*Id.* ¶ 31,32.)  Plaintiff's PIP was prepared by Weismann, and included

the requirement that plaintiff submit the following reports and documentation in a timely

manner: performance evaluations of plaintiff's technicians; Quality Control Inspections; Safety

Roll-Up Inspections, Vehicle Inspections, and confirmation of Tool Box Meetings.[2]  (*Id.*)

At the time of the events at issue in 2006-2007, Michael Louisor, who is African

American, was the Human Resources Manager.  (*Id.* ¶ 10.)   Sam Magliaro was the Managing

Director, Alex Torres was the Director of Field Operations, and William Entenmann was the

Director of Administration.  (Louisor Decl. (Doc. No. 83) ¶ 10.)

Plaintiff and Weismann first met to review the December 2006 evaluation and resultant

PIP on January 13, 2007. (*Id.* ¶43.)  The PIP included a 90-day review period, during which

Hayes was expected to timely complete the reports required thereby.  (*Id.* ¶¶ 47, 49.)  In

February 2007, Christopher Connor, who is white, transferred to the Brooklyn Facility as an

AOM and became plaintiff's supervisor.  (*Id.* ¶ 52.)  As part of his position, Connor became

responsible for oversight of Hayes' progress through the PIP.  (*Id.* ¶ 54.)  Connor, Weismann and

plaintiff met on February 16, 2007, to discuss the requirements of the PIP.  (*Id.* ¶¶ 55-57.)

Plaintiff was required to prepare and submit to Connor performance evaluations of Hayes'

---

[2] All supervisors were required to complete annual performance evaluations of the technicians reporting to them, and submit the evaluations to Human Resources six weeks before the anniversary of the technician's date of beginning employment with Cablevision.  (Declaration of Barbara Hoey, attorney for Cablevision (Doc. No. 82) Ex. A, Pl. Dep. 113-118.)  Additionally, six Quality Control Inspections per month per technician were required of supervisors. (*Id.* 118, 216.)  This entailed checking the quality of the technician's work, either as the technician did the work at the customer's home ("live inspections") or at some later date. (*Id.* 170-72.)  Supervisors were also required to perform bi-weekly Field Safety Inspections ("Safety Roll-ups") of technicians. (*Id.* 118, 170, 193)  Vehicle Safety Inspections, when a supervisor inspected each technician's vehicle and the safety equipment issued as part of the vehicle, were required quarterly.  (*Id.* 170.)  Tool Box Meetings were held at the beginning of a work shift, between a supervisor and the technicians who reported to him.  (*Id.* 187.)  Each supervisor was required to submit documentation of each Quality Control Inspection, Safety Roll-up, Vehicle Safety Inspection, and Tool Box Meeting to the Area Operations Manager ("AOM").

Technicians; Quality Control Inspections; Safety Roll-Up Inspections, Vehicle Inspections, and confirmation of Tool Box Meetings.  (*Id.* ¶ 48.)  Hayes was reminded that he had to submit documentation and reports in a timely fashion so that Connor could verify he was meeting the PIP requirements.  (*Id.* ¶¶ 56-57.)

Thereafter, Connor met with plaintiff on a bi-weekly basis to discuss the documentation plaintiff was required to submit, and his completion of the goals of the PIP.  (*Id.* ¶¶ 55, 61-69, 81-86, 99-106, 118-122.)  Connor prepared summaries of these meetings, as well as the documentation submitted by Hayes, and reviewed them with Michael Louisor.  (*Id.* ¶¶ 59-60, 63-64, 68-69, 85-86, 105-106, 121-122.)  These summaries were reviewed at the close of plaintiff's PIP, to evaluate his progress and completion of the goals of the PIP.  (*Id.* ¶ 128.)  The summaries of every meeting reflect that required documentation was missing or incomplete, in addition to other problems with plaintiff's performance, such as his failure to complete "check-in" duties when required.[3]  (Connor Decl. (Doc. No. 85) Ex. A, B, C, E, F & H.)

On March 19, 2007, plaintiff was assigned to be the "Single Point of Contact" ("SPOC") for the day at the Brooklyn Facility.  (Def. Rule 56.1 Statement (Doc. No. 82) ¶¶ 70-72.)  This was an assignment rotated among the supervisors at the Brooklyn Facility, requiring the "SPOC" to address all customer complaints and technician problems arising in the Facility that day.  (*Id.* ¶¶ 71.)  SPOC duty meant being "responsible for all daily operations of the company that day." (Hoey Decl., (Doc. No. 82) Ex. A, Pl. Dep. 163.)  Instead of overseeing daily operations as assigned, plaintiff instead went out into the field.  Plaintiff received three phone calls from the Brooklyn Facility: one call from Supervisor Temaine Peltzer, directing him to return to the

---

[3] The "check-in" supervisor is required to stay until all technicians arrive back to the facility safely.  On March 17, 2007, plaintiff called Connor to advise that he didn't feel he should have to stay to complete "check-in," citing his displeasure at having received a rating of "2" on his last performance evaluation as the reason for leaving early. (Connor Decl. (Doc. No. 85) Ex E.)

Facility, which plaintiff did not do; a second call from AOM Arnold Carroll, indicating that

Carroll would contact Director Alex Torres regarding plaintiff's absence; and a third call from

Torres, directing plaintiff to return, in response to which plaintiff did return to the Facility.  (*Id.*

¶¶ 73-77.)

On March 19, 2007, AOM Carroll wrote a memorandum to Director Torres and Connor

reporting the SPOC incident.  (Def. Rule 56.1 Statement (Doc. No. 82) ¶ 78; Connor Decl. (Doc.

No. 85) Ex. D.)  Torres and Entenmann (Director of Administration, Brooklyn) decided to give

plaintiff a written reprimand for the incident, which was viewed as insubordinate and a

dereliction of his duties.  (Connor Decl. (Doc. No. 85) Ex. G.)  Plaintiff admitted in his

deposition that he did not properly perform his SPOC duties, and does not believe the warning

had anything to do with his race.  (Def. Rule 56.1 Statement (Doc. No. 82) ¶ 80.)  Connor made a

note regarding the pending corrective action in his report of the March 23 PIP meeting, (*id.* ¶

84.), which indicated plaintiff's failure to complete SPOC duties as assigned on March 19.

(Connor Decl. (Doc. No. 85) Ex. E.)

On March 30, 2007, Torres and Connor held a regularly scheduled Supervisors' meeting

with all eleven of the Supervisors at the Brooklyn Facility (ten of whom were African

American.)  (*Id.* ¶¶ 87-88.)  At the meeting, Connor raised the issue of compliance with

Cablevision's uniform policy and reminded the supervisors that Cablevision policy required

them to wear Red Wing brand boots.  (*Id.* ¶¶ 89-90.)  Plaintiff was sitting next to Connor,

wearing Timberland brand boots, with the laces of one boot untied.  (*Id.* ¶¶ 91-92.)  Connor

asked Hayes to "stand in the corner."  (*Id.* ¶ 93.)  Connor then stepped over to Hayes and tried to

lift Hayes' pant leg.  (*Id.* ¶ 94.)

Connor told those present that Timberland boots did not comply with uniform policy, and that it was unsafe for a supervisor to walk around with a boot untied.  (*Id.* ¶ 95.)  Plaintiff testified that "[Connor] said that [I] was wearing my Timberlands with the tag hanging out looking like a thug."  (Hayes Decl. (Doc. No. 89) ¶ 47.)  Connor denies using the term "thug." (Mem. Supp. Def.'s Mot. Summ. J. (Doc. No. 82) ¶ 19.)  Nigel Williams, a supervisor present at the meeting, testified at his deposition that untied boots are not generally in compliance with dress code, and that he did not feel that Hayes was singled out in the March 30 meeting because he is African American.  (*See* Hoey Decl. (Doc. No. 86) Ex. O.)  Williams also reported that he could see that Hayes' boots were untied ("the tongue was hanging down") from where he was sitting at the table.  (*See id.*)

On April 2, 2007, plaintiff received the formal written notice of the reprimand issued to him by Connor following the SPOC incident.  (Def. Rule 56.1 Statement (Doc. No. 82) ¶ 107; Connor Decl. (Doc. No. 85) Ex. G.)  On the same day, plaintiff also complained to Entenmann about Connor's behavior at the March 30 meeting.  (*Id.* ¶ 108.)  Hayes testified at his deposition that he told Entenmann that he was "upset," "embarrassed," and felt "humiliated" by Connor. (*Id.*)  Plaintiff further stated that Connor used a "harsh, mean voice," and that plaintiff was baffled, shocked, humiliated and embarrassed by the incident.  (Hayes Decl. (Doc. No. 89) ¶¶ 44-48.)  In his later declaration, Hayes reported that he was concerned about protecting his employment and wanted Connor to be disciplined for what Hayes perceived as clear racial bias; Hayes also claimed that he told Entenmann that he felt that he had been the victim of racial discrimination, and that he felt like a slave and like Connor was a slave owner.  (Hayes Decl. (Doc. No. 89) ¶¶ 49-59.)  Entenmann's contemporaneous records of this meeting reflect that Hayes complained merely of feeling humiliated by "the singling out and the unwanted physical

contact." (Def. Rule 56.1 Statement (Doc. No. 82) Ex. M).  Hayes asked that he not report to

Connor, but Entenmann declined this request.  (Def. Rule 56.1 Statement (Doc. No. 82) ¶ 113.)

There were two complaints from customers related to Hayes' performance during his PIP

period.  The first occurred on April 7, 2007.  (*See id.* ¶¶ 114-17.)  Weismann had instructed

Hayes to ensure a specific customer's problem be addressed in the morning of April 7.  (*Id.* ¶

115.)  The customer called at 2 pm and reported that no one had shown up for the appointment.

(*Id.* ¶ 116.)  Weismann sent an Email to Connor reporting the complaint on the same day,

indicating that he expected the supervisor (Hayes) to ensure a particular Technician was sent to

do the job, and that a supervisor follow up, but neither was done.  (*Id.* ¶ 117.)  Hayes stated that

he assigned the call to Modeste, one of his Technicians, but that dispatch ignored the assignment

and sent a contractor, who failed to show up.  (Hayes Decl. (Doc. No. 89) ¶ 63.)

A second customer complaint occurred on April 20, 2007.  (*See* Def. Rule 56.1 Statement

(Doc. No. 82) ¶¶ 123-25), which was relayed to Connor by a call center supervisor.  (*Id.* ¶ 123.)

The customer ("Wagner") had initially left a message for Hayes on Monday evening, but since

Hayes' work schedule is Friday through Monday, Hayes did not return Wagner's call before

Wagner called to complain on Thursday afternoon.  (Def. Rule 56.1 Statement (Doc. No. 82) ¶¶

124-25; Hayes Decl. (Doc. No. 89) ¶ 64.)  Upon his return to work on Friday, April 20, Hayes

addressed Wagner's service concerns to Wagner's satisfaction.  (Hayes Decl. (Doc. No. 89) ¶ 64;

LeBow Decl. (Doc. No. 88) Ex. B.)

Hayes' 90-day PIP period ended on April 27, 2007.  (Def. Rule 56.1 Statement (Doc. No.

82) ¶ 126.)  As is Cablevision's practice, at the end of the PIP, Hayes' performance was

reviewed by the management team: William Entenmann, Susan Crickmore from Human

Resources, and Sam Magliaro, the Managing Director for the Brooklyn Facility.  (*Id.* ¶¶ 127-

128.)  The team considered Connor's reports on Hayes' progress through his PIP, the formal written reprimand Hayes received while on the PIP, and the two complaints from customers, and determined that Hayes had not met all of the goals in his PIP.  (*Id.* ¶¶ 128-29.)  In light of his unsatisfactory 2006 evaluation and subsequent job performance, the management team (Entenmann, Crickmore, and Magliaro) decided to terminate Hayes' employment.  (*Id.* ¶¶ 129-30.)  Dargyle Campbell, who is African American, was promoted to replace Hayes as Field Service Supervisor.  (*Id.* ¶ 134.)

Plaintiff does not dispute that defendants set forth the foregoing reasons as justification for his termination.  However, he contends that Connor's reports were false, the written reprimand for the SPOC incident occurred after Torres had indicated Hayes would not be disciplined, and the customer complaints were not his fault; therefore, he reasons, discrimination and retaliation by Connor for plaintiff's April 2 complaint are the most likely explanations for his termination.  (Hayes Decl. (Doc. No. 89) ¶ 65.)

## STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine issue as to any material fact" such that the moving party is entitled to "judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In deciding a summary judgment motion, a district court must draw all reasonable inferences in favor of the non-moving party.  *See id.* at 249 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 155-59 (1970)).  The court must not "weigh the evidence, but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments."  *Amnesty*

8

*Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2007) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)).

Courts are obliged to exercise particular caution in determining whether to grant summary judgment dismissing claims of discrimination, because direct evidence of an employer's discriminatory intent is rare and "must often be inferred from circumstantial evidence." *Schiano v. Quality Payroll Sys.*, *Inc.,* 445 F.3d 597, 603 (2d Cir. 2006). "A trial court must be cautious about granting summary judgment to an employer where, as here, its intent is at issue." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994) (internal quotation marks omitted). "Affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Id.* However, as the Second Circuit has noted, it "is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).

Despite the caution required of courts in deciding a motion for summary judgment, a plaintiff cannot defeat such a motion simply by presenting "conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998). Even in the discrimination context, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment... and show more than some metaphysical doubt as to the material facts." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010). "Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." *Shannon v. N.Y. City Transit Auth.*, 332 F.3d 95, 99 (2d Cir. 2003) (internal quotation marks omitted); *see also Anderson*, 477 U.S. at 256-57 (non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and

9

specific evidence showing that there is a genuine issue for trial); *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) ("[U]nsupported allegations do not create a material issue of fact"); *Bickerstaff v. Vassar College*, 196 F.3d 435, 452 (2d Cir. 1999) ("Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.")

## DISCUSSION

Defendants contend that this case presents no disputed issue of fact, and that they are entitled to judgment as a matter of law because plaintiff has failed to meet his burden under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). In particular, defendants argue that summary judgment is appropriate because plaintiff has failed to raise an inference of racial discrimination necessary for a *prima facie* case. Alternatively, defendants argue that summary judgment is appropriate because plaintiff cannot show that defendants' legitimate, non-discriminatory reasons for plaintiff's termination were pretextual. In addition, defendants argue that summary judgment is appropriate for plaintiff's retaliation claim, because plaintiff has not presented evidence from which a fact-finder could conclude that there was a causal connection between plaintiff's complaint to his supervisor and his later termination.

## I.     § 1981 Race Discrimination Claim

Plaintiff claims that his termination was motivated by race discrimination in violation of Section 1981, which guarantees equal rights to "make and enforce contracts." 42 U.S.C. § 1981. Plaintiff's claim is subject to analysis under the burden-shifting framework set forth in *McDonnell Douglas*. *See Hicks v. Baines*, 593 F.3d at 163 (citing *Patterson v. Cty. Of Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir. 2004) ("Most of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of

discrimination in employment in violation of § 1981 or the Equal Protection Clause."); *see also Dixon v.Int'l Fedn. of Accountants*, No. 09-2839, 2010 U.S. Dist. LEXIS 35348 at *11-12 (S.D.N.Y. April 9, 2010) ("Discrimination claims under Title VII [and] § 1981 … are analyzed identically for the purposes of this action," where the claims at issue were for age, race, and national origin discrimination) (citing, *e.g.*, *Gorzynski*, 596 F.3d at 106; *Weinstock*, 224 F.3d at 42)..  Under this test, a plaintiff must first establish a *prima facie* case of discrimination by demonstrating that (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination.  *See Gorzynski*, 596 F.3d at 107; *see also Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 492 (2d. Cir. 2010).  The plaintiff's burden in presenting evidence to support a *prima facie* case of discrimination is "*de minimis*." *Weinstock*, 224 F.3d at 42; *see also Sassaman v. Gamache*, 566 F.3d 307, 312 (2d Cir. 2009) (citation omitted).

Once plaintiff has established a *prima facie* case, the burden then shifts to the employer to articulate a "legitimate, non-discriminatory reason" for the employment action.  *McDonnell Douglas*, 411 U.S. at 802-03.  In other words, "[t]he defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, *if believed by the trier of fact,* would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507 (1993) (internal quotation marks omitted) (emphasis in original).

Upon the defendant's proffer of such a reason, the presumption of discrimination arising with the *prima facie* case "drops from the picture." *Weinstock*, 224 F.3d at 42 (citing *St. Mary's Honor Ctr.*, 509 U.S. at 510-11).  The plaintiff must then establish that the defendant's proffered

11

reason is a mere pretext for actual discrimination.  *See McDonnell Douglas*, 411 U.S. at 804;

*Weinstock*, 224 F.3d at 42.  The plaintiff must produce "sufficient evidence to support a rational

finding that the legitimate, non-discriminatory reasons" presented by the defendant were false,

and that "more likely than not, discrimination was the real reason for the employment action."

*Weinstock*, 224 F.3d at 42 (internal quotation marks and alterations omitted).  "In short, the

question becomes whether the evidence, taken as a whole, supports a sufficient rational inference

of discrimination."  *Id.*  Plaintiff at all times bears the "ultimate burden of persuading the trier of

fact that the defendant intentionally discriminated against the plaintiff."  *Leibowitz v. Cornell*

*Univ.*, 584 F.3d 487, 499 (2d Cir. 2009) (citation omitted).  "[I]t is not enough … to disbelieve

the employer; the factfinder must [also] believe the plaintiff's explanation of intentional

discrimination."  *St. Mary's Honor Ctr.*, 509 U.S. at 519 (emphasis omitted).

> ### A.   *Prima facie* **case of discrimination not established, for failure to raise an inference of discrimination**

Defendant does not dispute that plaintiff satisfies the first three requirements of a *prima*

*facie* case.  Plaintiff is African-American, his employment was terminated, and he need only

show a minimal level of qualification for his job in order to make a *prima facie* case.  "[T]he

qualification necessary to shift the burden to defendant for an explanation of the adverse job

action is minimal; plaintiff must show only that he 'possesses the basic skills necessary for

performance of [the] job.'" *Slattery v. Swiss Reins. Amer. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001)

(citation omitted).

At issue in this case is whether the uncontroverted evidence and all reasonable inferences

in plaintiff's favor drawn therefrom, give rise to an inference of discrimination sufficient to

satisfy the fourth element.  The plaintiff's burden in presenting evidence to support a *prima facie*

case of discrimination is "*de minimis*."  *Weinstock*, 224 F.3d at 42.

While the evidence required to establish an inference of discrimination at the summary judgment stage is minimal, speculation or conclusory statements are not enough.  "Speculation, conclusory allegations and mere denials are not enough to raise genuine issues of fact.  To avoid summary judgment, enough evidence must favor the nonmoving party's case such that a jury could return a verdict in its favor."  *Greenblatt v. Prescription Plan Servs. Corp.*, 783 F. Supp. 814, 819-20 (S.D.N.Y. 1992) (citations omitted).  "While a court must interpret all evidence in favor of the [non-moving party], it need not blindly accept [that party's evidence] where that [evidence] is largely unsubstantiated and is contradictory and incomplete."  *Alam v. HSBC Bank USA*, 2009 WL 3096293, at *11 (S.D.N.Y. Sept. 28, 2009).  Courts must keep in mind the fact that "employers are rarely so cooperative as to include a notation in the personnel file that the firing is for a reason expressly forbidden by law," *Bickerstaff*, 196 F.3d at 448, as well as consider the evidence in the light most favorable to the plaintiff; however, a nexus must be established between the plaintiff's race and his termination.  Plaintiff must still establish that the treatment complained of was motivated by unlawful discrimination.  *See Fitzgerald v. Henderson*, 251 F.3d 345, 365 (2d Cir. 2001).  "Simply put, plaintiff must demonstrate that the conduct occurred because of, not incidental to, the protected characteristic."  *White v. N.Y. City Dep't of Educ.*, 2008 U.S. Dist. LEXIS 79002, at *13 (E.D.N.Y. Sept. 30, 2008) (citing *Fitzgerald*, 251 F.3d at 365).  Taking the facts in the light most favorable to plaintiff, and drawing all reasonable inferences therefrom, for the reasons below, plaintiff cannot establish an inference of discrimination.

### 1.    Connor's reports and the SPOC reprimand

First, plaintiff relies on what he perceives to be errors and misstatements in Connor's as evidence of Connor's discriminatory animus.  Plaintiff claims that "[e]very summary Connor

prepared of his meetings with [me] contained deliberate misstatements about [my] performance on the PIP." (Hayes Decl. (Doc. No. 89) ¶¶ 17-19, 26.)  In support of this assertion, plaintiff points to the meeting on March 23, 2007, for which Connor's report indicates that of six areas of performance, plaintiff failed to complete or document four: Quality Control Inspections, Safety Roll-Ups, Performance Appraisals, and compliance with the Employment Equipment Verification Initiative.  (*Id.* ¶¶ 26-41.)  Plaintiff alleges that during the meeting of March 23, he and Connor agreed that the inspections plaintiff had already completed would be deemed sufficient, because of the other demands on plaintiff's time at work.  (*Id.* ¶¶ 26-41.)  Thus, plaintiff argues, Connor should not have recorded the Quality Control and Safety Roll-Ups as incomplete.  (Pl. Mem. Opp. Def.'s Mot. Summ. J. (Doc. No. 87) ¶¶ 29-35.)  Connor does not directly dispute this argument, which plaintiff first raised in his Opposition to Defendant's Motion (*id.*); instead, Connor stated in his declaration that at the March 23 meeting, he told Hayes that his performance and documentation were not in compliance with the goals of Hayes' PIP, and that he asked Hayes to submit missing or incomplete documentation.  (Connor Decl. (Doc. No. 85) ¶¶ 34-39.)  Similarly, plaintiff contends that he did complete the Performance Appraisal on time, and that the failure to comply with the Employment Equipment Verification Initiative was not his fault.  (*Id.* ¶¶ 37-41.)  Plaintiff adds, and the record suggests, that he submitted the Performance Appraisal at issue eight days earlier than Connor had recorded it. (*See* LeBow Decl. (Doc. No. 88) Ex. A.)  Even if true, that submission would still have been past the deadline and thus late, as recorded.  Plaintiff submits no evidence regarding any other meeting, nor does he present any evidence to support his claims that Connor was "falsifying reports," making "deliberate misstatements" or generally "sabotaging" plaintiff.  (*See* Hayes Decl. (Doc. No. 89) ¶¶ 19, 26.)

14

All of plaintiff's claims are without merit.  "An employee's disagreement with [his] employer's evaluation of [his] performance is insufficient to establish discriminatory intent." *Mattera*, 740 F. Supp. 2d at 576 (quoting *Ricks v. Conde Nast Pubs., Inc.*, 6 Fed. Appx. 74, 78 (2d Cir. 2001)); *see also Valentine v. Standard & Poor's*, 50 F. Supp. 2d 262, 284 (S.D.N.Y. 1999) ("[P]laintiff's subjective disagreement with his reviews is not a viable basis for a discrimination claim.")  Alleging mistreatment and asking the court to conclude that it must have been related to his race is not sufficient.  *See Lizardo v. Denny's, Inc.*, 270 F.3d 94, 104 (2d Cir. 2001); *see also Grillo v. NYC Transit Auth.*, 291 F.3d 231, 235 (2d Cir. 2001) (in the absence of evidence of supervisors' racial animus, their reports on plaintiff's poor performance cannot support a finding of discrimination, even assuming the supervisors distorted or lied about plaintiff's poor performance); *Desir v. Bd. of Coop. Educ. Servs.*, F. Supp. 2d 168, 177 (E.D.N.Y. 2011) (plaintiff's testimony that he did not deserve the evaluations he received, and his conviction that procedural irregularities were meant to stymie his progress because of his race, were not sufficient to show any nexus between race and adverse action).

Plaintiff urges this court, first, to find that Connor's reports contained errors and did not reflect plaintiff's job performance; second, to find that these errors were intentional misrepresentations of plaintiff's performance; and finally, to conclude that since Connor had no reason to misrepresent plaintiff's performance, but did so anyway, the most likely explanation is that Connor was motivated by discriminatory animus.  Other than this chain of speculative inferences, plaintiff presents no evidence that Connor's alleged reporting errors were motivated by racial bias.  The evidence, viewed in the light most favorable to plaintiff, supports, at most, a conclusion that Connor reported plaintiff's performance on his PIP as somewhat more deficient than plaintiff's actual performance, which was still not in compliance with defendant's

15

expectations.  Connor's actions were facially non-discriminatory, and plaintiff fails to offer anything but conclusory assertions that they were motivated by animus towards his race.  If plaintiff himself cannot articulate evidence of racial discrimination in his termination, no reasonable jury could possibly find it, and summary judgment for defendant is warranted.  *See Brown v. AstraZeneca Pharms., L.P.*, 2006 U.S. Dist. LEXIS 57377, at \*25 (E.D.N.Y. Aug. 26, 2006).

Plaintiff also imputes discriminatory animus to Connor because of the formal warning issued to plaintiff following the SPOC incident.  Plaintiff alleges that Torres, Connor's superior, had promised plaintiff that he would not be disciplined for the incident, and further, that Connor was aware of this promise.  (*See* Hayes Decl. (Doc. No. 89) ¶¶ 20-25.)  However, Connor testified that he was directed by Torres to prepare a written reprimand for Hayes, and that they reviewed the reprimand together before it was given to Hayes.  (Connor Decl. (Doc. No. 85) ¶¶ 49-52.)  Even viewing the evidence in a light most favorable to plaintiff, these allegations are simply not supported by any evidence in the record other than plaintiff's bald, conclusory statements.  (*See* Hayes Decl. (Doc. No. 89) ¶¶ 20-25.)

## 2.    Evidence of discriminatory animus

First, plaintiff alleges that Connor betrayed racial animus by accusing him of "looking like a thug"[4] in the Supervisors' Meeting on March 30, 2007, and by his generally hostile behavior towards Hayes.

On its face, the term "thug" is race neutral.  *See, e.g.*, *Random House Webster's College Dictionary* (2d ed. 1997) ("a vicious criminal or ruffian.")  No court in this Circuit has held that

---

[4] Connor denies using the term "thug," but we assume for the purposes of this analysis that plaintiff's accusations are true and that Connor did use the term "thug" in admonishing Hayes.

"thug" is a racial epithet sufficient to raise an inference of discrimination.[5]  A facially neutral insult could constitute "harassment motivated by racial animus" if "uttered in an environment otherwise marked by abundant racial animosity or under circumstances that render it an expression of racial antipathy."  *Evans v. Nine West Group, Inc.*, No. 00-4850, 2002 U.S. Dist. LEXIS 6427, at *21 (E.D.Penn. April 15, 2002).  In the absence of any other evidence suggesting a racially hostile environment, however, use of the term "thug" does not suffice to create one.  *See White*, 2008 U.S. Dist. LEXIS 79002, at *14-15 (where the only evidence of discrimination was incident when defendant called plaintiff a "sick-minded woman" and plaintiff acknowledged that defendant did not reference her race or national origin in that or any other exchange, use of the insult "sick-minded woman" connoted no racial, ethnic, or even gender bias sufficient to give rise to an actionable Title VII claim).

Even assuming *arguendo* that Connor did call Hayes a "thug," his use of that term may have been insulting and unprofessional, but, standing alone, it does not establish an inference of discrimination and thus does not create a triable issue of fact.  "Title VII solely addresses conduct motivated (a) by animus towards members of a protected class and (b) because of the victim's protected characteristics; it does not reach instances of generally poor behavior, personal animosity or even unfair treatment."  *White*, 2008 U.S. Dist. LEXIS 79002, at *14 (citing *Pesok v. Hebrew Union Coll.,* 235 F. Supp. 2d 281 (S.D.N.Y. Dec. 5, 2002)).  Such unprofessional conduct is "not irrelevant in assessing the strength of plaintiffs' circumstantial evidence of race-based animus," but "it is certainly not sufficient to establish it.  We can envision many circumstances where markedly hostile treatment … would raise no inference of racial

---

[5] In *Bronner v. Catholic Charities of the Roman Catholic Diocese of Syracuse*, 2010 WL 981959, at *6, *13 (N.D.N.Y. March 15, 2010), the Court cites the use of the term "thug" by plaintiff's coworker, to refer to an African American person unrelated to the action, as part of plaintiff's evidence of racially motivated conduct by coworkers, and went on to hold that plaintiff had failed to present sufficient evidence of actionable race-based harassment.

animus." *Desir*, 803 F. Supp. 2d at 177 (quoting *Lizardo*, 270 F.3d at 102).  It would require a chain of inferences, for which there is no support in the record, to conclude that the remark reflected racial animus. *Cf. Kelly v. Metro-North Commuter R.R.*, No. 87–5817, 1989 U.S. Dist. LEXIS 15025, at *3, *6 (S.D.N.Y. Dec. 18, 1989) (in the context of defendant's derogatory comments as to plaintiff's religion and his remark that "the lousy liberal Jews are ruining this country," his statement "you don't fit in" when requesting plaintiff's resignation, while facially neutral, required "a logical leap of the smallest kind" to conclude that defendant was referring to plaintiff's religion and established direct evidence of discrimination).

Even assuming that "thug" is a racially charged term, the evidence still does not give rise to an inference of discrimination.  First, this Circuit has repeatedly held that stray remarks in the workplace, by themselves, and without a demonstrated nexus to the contested personnel actions, will not defeat the employer's motion for summary judgment.  *See, e.g.*, *Desir*, 803 F. Supp. 2d at 28 ("'Stray remarks by non-decision-makers … are rarely given great weight,' and even stray comments by a decision-maker will not support a Title VII discrimination suit.") (quoting *Haskell v. Kaman Corp.*, 743 F.2d 113, 120 (2d Cir. 1984) and citing *Danzer v. Norden*, 151 F.3d 50, 56 (2d Cir. 1998)); *De La Cruz v. N.Y. City Human Resources Admin. Dep't of Soc. Servs.*, 884 F. Supp. 112, 116 (S.D.N.Y. 1993) (employer's motion for summary judgment granted when plaintiff's work contained "numerous and critical errors," despite allegations of stray racial remarks); *Dixon v. Int'l Fedn. of Accountants*, No. 09-2839, 2010 U.S. Dist. LEXIS 35348, at *17 (S.D.N.Y. April 9, 2010) ("Stray remarks that are not related to Dixon's discharge or neutral remarks unrelated to her protected group status are insufficient to demonstrate that she was terminated for discriminatory reasons.").

Plaintiff also attempts to rely on hearsay statements made by other employees in attributing racial animus to Connor.  (*See* Pl. Mem. Opp. Def.'s Mot. Summ. J. (Doc. No. 87) at 20-21, citing Pl. Dep. 761-2, 764, 766. (alleging in his deposition testimony that three other supervisors present at the March 30 meeting had said Connor Connor liked to embarrass black people, that Connor had a "slave owner mentality," and that Connor treated the supervisors like slaves).)[6]  None of this evidence is presented in the form of affidavits or deposition testimony from the speakers; allegations solely from plaintiff about what other employees perceived as Connor's motivations are inadmissible hearsay and cannot be considered on a motion for summary judgment.  *See* Fed. R. Civ. P. 56(e)(1); *see also Murphy v. Gen. Elec. Co.*, 245 F. Supp. 2d 459, 468 (N.D.N.Y. 2003) (a party cannot rely on inadmissible hearsay to oppose a motion for summary judgment, absent a showing that the evidence will be available at trial) (citing *Burlington Coat Factory v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985)); *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 123 (2d Cir. 2001) ("It is appropriate for a district court ruling on summary judgment to consider only admissible evidence."); *H. Sand & Co. v. Airtemp. Corp.*, 934 F.2d 450, 454-55 (2d Cir. 1991) (a court will not entertain inadmissible hearsay in ruling on a summary judgment motion).   In fact, in the only admissible testimony relevant to this point, another employee, present at the March 30 meeting where this remark was alleged made, testified  that plaintiff was not singled out for criticism of his footwear because of his race, and that neither Connor nor any other manager ever used "racial language." (Hoey Decl. (Doc. No. 86) Ex. O, Dep. Nigel Williams.)

---

[6] The pages of plaintiff's deposition transcript quoted in Pl. Mem. Opp. Def.'s Mot. Summ. J. (Doc. No. 87) at 20-21 are not in the record before the Court.  Both plaintiff and defendant submitted excerpts of plaintiff's deposition transcript (LeBow Decl. (Doc. No. 88) Ex. A, and Def. Rule 56.1 Statement (Doc. No. 82) Ex. A, respectively) but the pages in question are not found in those exhibits.

Moreover, even assuming sufficient comments evincing discriminatory animus, they must bear a sufficient nexus to the adverse employment action. "This connection exists if the comments were made by the decision-maker or by someone who had great influence over the decision-maker." *Brown v. AstraZeneca Pharms., L.P.*, 2006 U.S. Dist. LEXIS 57377, at *19 (E.D.N.Y. Aug. 26, 2006). Comments made by someone without a direct role in the termination decision are not probative of an intent to discriminate behind that decision. *See Desir*, 803 F. Supp. 2d at 16 ("The more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination.") (quoting *Tomassi v. Insignia Fin. Group, Inc.,* 478 F.3d 111, 115-16 (2d Cir. 2007)); *see also Griffin v. Ambika Corp.,* 103 F. Supp. 2d 297, 309 (S.D.N.Y. 2000) (finding that it was "fatal" to plaintiffs' case that they only alleged discriminatory statements by co-workers, not anyone involved in the decisions to terminate their employment). On the facts here, plaintiff would have to show that Connor exerted influence over the decision-makers or otherwise affected the termination decision, in a way that his alleged discriminatory animus can be imputed to the decision-makers. *See Brown*, 2006 U.S. Dist. LEXIS 57377, at *22. Plaintiff has not done so.

Plaintiff argues that reliance on Connor's reports by Entenmann, Crickmore, and Magliaro, the management team responsible for Hayes' termination, provide a sufficient nexus to suggest discriminatory motive behind his termination. However, the undisputed record demonstrates that Hayes was terminated for a number of incidents which plaintiff does not dispute occurred that were well beneath the requirements of plaintiff's PIP. (*See* Def. Rule 56.1 Statement (Doc. No. 82) ¶¶ 126-30.) There is nothing in the record to indicate that these incidents did not occur, that they were not in conformance with the PIP, and that Connor, an intermediate supervisor subordinate to Entenmann and Magliaro, had the type of any other

20

influence over the decision to terminate plaintiff other than writing up the reports documenting the incidents.  This is hardly the type of "enormous influence in the decision-making process" that would be sufficient.  *Brown*, 2006 U.S. Dist. LEXIS 57377, at *22 (quoting *Rose v. N.Y. City Bd. of Educ.*, 257 F.3d 156, 162 (2d Cir. 2001)).

Assuming *arguendo* that Connor's reports misrepresented plaintiff's performance, the decision to terminate plaintiff's employment based on those reports still does not raise an inference of discrimination.  As discussed above, there is no evidence of animus underlying those reports, nor is there anything in the record to indicate that the management team did not rely on Connor's reports in good faith.  "An employer may rely on even erroneous information in making employment decisions, so long as it does so in good faith."  *Octobre v. Radio Shack Corp.,* No. 07-3311, 2010 WL 850189, at *9 (S.D.N.Y. Mar. 11, 2010) (employer's reasons for termination found not pretextual when plaintiff admitted his failure to comply with employer's inventory requirements, but argued, without submitting evidence, that he was permitted or instructed not to do the inspections); *see also Adia v. MTA Long Island R.R. Co.*, 2006 WL 2092482, at *9 (E.D.N.Y. July 26, 2006) (even if the defendant's "investigation's findings [were] incorrect, when an employer relies on information in good faith in making an employment decision," that decision is not pretextual).  Plaintiff challenges only the accuracy of Connor's reports, and speculates as to his motives in making them, but does not challenge the management team's reliance on those reports.  Thus, viewing the evidence in the light most favorable to plaintiff, the termination decision was reasonable and did not raise an inference of discrimination.  "The ultimate inquiry is concerned with whether considerations of race played a role in the employer's decisions, not with the wisdom of the employer's disciplinary

determinations." *Bronner v. Catholic Charities of the Roman Catholic Diocese of Syracuse, Inc.*, No. 3:08-0015, 2010 WL 981959, at *11 (N.D.N.Y. Mar. 15, 2010).

Nor are plaintiff's subjective feelings of humiliation at the Supervisors' Meeting, and his assertions of feeling like he was a "slave" and Connor was a "slave master" sufficient to raise an inference of discriminatory intent, absent any evidence of racial animus behind Connor's acts. "It is not enough that [plaintiff] sincerely believes that [she] was the subject of discrimination; 'a plaintiff is not entitled to a trial based on pure speculation, no matter how earnestly held.'" *Ali v. Mount Sinai Hosp.*, No. 92-6129, 1996 U.S. Dist. LEXIS 8079 at *22-23 (S.D.N.Y. June 12, 1996) (quoting *Fitzgerald v. Allegheny Corp.*, 904 F.Supp. 223, 230 (S.D.N.Y. 1995)). Connor's "mean, hostile" tone as alleged by plaintiff, does not support a claim of discrimination. It is well established that Title VII "does not set forth 'a general civility code for the American workplace.'" *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (citing *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006) and quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998) (citing cases instructing that "discourtesy or rudeness should not be confused with racial harassment.").

### 3.   Failure to identify similarly-situated employees who received more favorable treatment

Arguably, plaintiff might raise an inference of discrimination were he to show that defendant treated him less favorably than a similarly situated employee outside of his protected class. *See, e.g., Ebanks v. New York City Dep't of Envtl. Prot.*, No. 05-3172, 2009 U.S. Dist. LEXIS 27402, at *6 (E.D.N.Y. March 31, 2009) (holding that no jury could find that adverse employment action was based on discriminatory animus when plaintiff "does not even argue - much less demonstrate - that he was treated less favorably than any similarly situated non-

22

minority employee.") (citing *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)).  "At the summary judgment stage, while [plaintiff] need not definitively prove that he was similarly situated to one or more comparator employees, he must, at the very least, point to facts that could reasonably support such a conclusion."  *Id.*  Plaintiff cannot do so.

Plaintiff does not rely on comparisons to such other employees, but instead refers generally to "white workers on PIPs, who did not experience discrimination and were evaluated fairly based on their actual performance."  (Pl. Mem. Opp. Def.'s Mot. Summ. J. (Doc. No. 87) at 18.)  Conclusory statements that "similarly situated" employees outside the protected class were treated more favorably are insufficient to defeat summary judgment.  *See Desir*, 803 F. Supp. 2d at 181 (general contentions that similarly situated individuals outside plaintiff's protected class were treated more favorably cannot even establish that there existed such similarly situated individuals, let alone establish a triable issue of fact); *see also Chan v. NYU Downtown Hosp.*, No. 03-3003, 2006 U.S. Dist. LEXIS 98887, at *5-6 (S.D.N.Y. Feb. 14, 2006) (statements alleging disparate treatment insufficient to establish *prima facie* case of discrimination because plaintiff did not identify any similarly situated individuals outside her protected class who were treated more favorably); *White*, 2008 U.S. Dist. LEXIS 79002, at *15 (same).

Moreover, the workforce at the Brooklyn Facility was diverse, including twelve African American Field Service/Outside Plant Supervisors and one Hispanic, of fifteen total.  (Def. Rule 56.1 Statement (Doc. No. 82) ¶ 8.)  Michael Louisor, the Human Resources Manager who reviewed and approved Connor's reports, was African American.  (*Id.* ¶ 10.)  Connor supervised eleven workers, ten of whom were African American, and there is no evidence any other supervisee suffered any adverse events.  No race-related jokes or comments were made in the

workplace.  (*Id.* ¶¶ 5, 11.)  Dargyle Campbell, who is African American, was promoted to replace Hayes as Field Service Supervisor.  (*Id.* ¶ 134.)  In particular, the fact that plaintiff was replaced by a member of the same protected class "weighs heavily against the inference of discrimination."  *Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d 552, 560 (S.D.N.Y. 2005) (citation omitted).

### B.    The Employer's Legitimate Non-Discriminatory Reasons and Pretext

Even assuming, *arguendo*, that plaintiff had established a *prima facie* case, defendant would still prevail because they have established that they had a legitimate reason for terminating plaintiff and plaintiff cannot establish that the reasons were pretext for discriminatory animus. At this stage, defendant's burden is "one of production, not persuasion."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).  Defendants need not prove non-discrimination at this stage; instead, they must "introduce evidence which, *taken as true*, would *permit* the conclusion that there was a non-discriminatory reason for the adverse action."  *St. Mary's Honor Ctr.*, 509 U.S. at 509 (emphasis in the original).

Once that is done, the *McDonnell Douglas* presumptions "disappear from the case." *James v. N.Y. Racing Ass'n.*, 233 F.3d 149, 156 (2d Cir. 2000), and plaintiff must show that the defendants' proffered reason for his discharge was actually pretext for unlawful discrimination. *See, e.g.*,  *Reeves*, 530 U.S. at 143; *Gorzynski*, 596 F.3d at 107.  Plaintiff produce "not simply 'some' evidence, but 'sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered … were false, and that more likely than not discrimination was the real reason for the employment action."  *Dixon v. Int'l Fedn. of Accountants*, No. 09-2839, 2010 U.S. Dist. LEXIS 35348 at *18 (S.D.N.Y. Apr. 9, 2010) (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (internal citations and quotations omitted)).  To do so,

plaintiff may point to "the strength of [his] *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employee's case and that properly may be considered on a motion for judgment as a matter of law."[7]  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148-49 (2000).

The crucial inquiry is whether the plaintiff has adduced sufficient evidence from which a reasonable finder of fact could find in his favor on the ultimate issue.  *James*, 233 F.3d at 153-54.  Relevant here, "[t]he ultimate question in every employment discrimination case … is whether the plaintiff was the victim of intentional discrimination."  *Reeves*, 530 U.S. at 153.  "[A] reason cannot be proved to be a 'pretext for *discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason."  *St. Mary's Honor Ctr.*, 509 U.S. at 515 (emphasis in the original).  The task "is to examine the entire record and, in accordance with *Reeves,* make the case-specific assessment as to whether a finding of discrimination may reasonably be made."  *Zimmerman*, 251 F.3d at 382.

### 1.    Performance reasons proffered by defendants

Defendants have set forth a legitimate business reason for Hayes' termination, namely, that Hayes had not met all of the goals in the PIP for the reasons set forth in Connor's reports, the formal written reprimand he received while on the PIP, and the complaints from customers.  (Def. Rule 56.1 Statement (Doc. No. 82) ¶¶ 128-129.)  The management team (Entenmann, Crickmore, and Magliaro) decided to terminate Hayes' employment in light of his 2006 evaluation and subsequent job performance.  (*Id.* ¶¶ 129-130.)

---

[7] For the purposes of this analysis, the standard for judgment as a matter of law is the same as that for summary judgment.  "Rule 50 requires a court to render judgment as a matter of law when a party has been fully heard on an issue, and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.  The standard for judgment as a matter of law under Rule 50 mirrors the standard for summary judgment under Rule 56." *Reeves*, 530 U.S. at 134.

When an employer comes forth with evidence of a long and well-documented history of deficient performance, the second stage of the *McDonnell Douglas* test is satisfied. *See O'Connor v. Viacom Inc.*, No. 93-2399, 1996 WL 194299, at \*4 (S.D.N.Y. Apr. 23, 1994).  A business decision, even one adverse to employees' interests, will not be questioned "so long as it does not mask invidious discrimination." *Brown*, 2006 U.S. Dist. LEXIS 57377, at \*26 (citing *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001), holding that the court's role "is to prevent unlawful hiring practices, not to act as a 'super personnel department' that second guesses employers' business judgments.")

To rebut these non-discriminatory reasons, plaintiff contests some of the underlying facts behind some of the performance-related reasons set forth by defendant as the basis for his termination, but he does not contest that the warnings, reprimands, customer complaints and his probation occurred.  Indeed, he provides no evidence sufficient to show that he performed his duties to the satisfaction of his employer, instead presenting mere conclusory statements that his failure to do so was "not his fault."  (Pl. Mem. Opp. Def.'s Mot. Summ. J.  (Doc. No. 87) at 7.) "Disagreements regarding poor performance evaluations and claims of good prior performance do not, as a matter of law or logic, mean that present poor performance reviews were unfounded." *Mattera*, 740 F. Supp. 2d at 574.  Simply disputing the basis for disciplinary action does not fulfill plaintiff's burden. *See id.* at 576.

Plaintiff has failed to demonstrate that his employer's accusations of poor job performance were only a pretext for race discrimination.  And where a lack of direct evidence does not compel summary judgment for defendants, s*ee Schiano*, 445 F.3d at 603, plaintiff still has the burden of proving discrimination as the reason for his termination; in order to survive a summary judgment motion, plaintiff must "point to evidence that reasonably supports a finding

26

of prohibited discrimination." *James v. N.Y. Racing Assoc.*, 233 F.3d 149, 154 (2d Cir. 2000). Plaintiff has not, and cannot do so.

Against this backdrop, plaintiff has not shown that defendant's legitimate, non-discriminatory reason for his termination - his poor performance - was pretext for unlawful discrimination.

**II.      § 1981 Retaliation Claim**

Plaintiff claims he was the victim of discriminatory retaliation when he was fired after his April 2 complaint about Connor's behavior in the March 30 meeting, relying on the temporal proximity between these two events.  (Hoey Decl. (Doc. No. 86) Ex. P).

Retaliation claims are evaluated under a three-step burden-shifting analysis, analogous to that applied to claims of discrimination in *McDonnell Douglas* analyses.  "First, the plaintiff must establish a *prima facie* case of retaliation by showing: (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (internal quotations omitted); *see also Gorzynski*, 596 F.3d at 110 (2d Cir. 2010).  "[T]he court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Hicks*, 593 F.3d at 164. If the plaintiff establishes a prima facie case, the burden shifts to defendants to "articulate a legitimate, non-retaliatory reason for the adverse employment action." *Id.*  If so, the presumption disappears and the plaintiff carries the burden of establishing that "retaliation was a substantial reason for the adverse employment … even if it was not the sole cause." *Id.* (quotation omitted).

A.      **Plaintiff did not engage in protected activity**

In the context of retaliation against a discrimination complaint, the first prong of the *prima facie* standard requires plaintiff to have taken "action … to protest or oppose statutorily prohibited discrimination." *Gore v. Health Research Inst.*, No. 02-2432, 2007 U.S. Dist. LEXIS 27993, at *41 (E.D.N.Y. April 16, 2007) (citation omitted). This protected activity must put the employer on notice that the employee feels that he has been the object of discrimination. *Id.* at *42. "Complaints about conduct prohibited by the statute need not mention discrimination or use particular language," but "ambiguous complaints that do not make the employer aware of alleged discriminatory misconduct do not constitute protected activity." *Id.* at *42-43 (quoting *Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC*, 470 F. Supp. 2d 345 (S.D.N.Y. 2007)) (quotation marks omitted).

Here, Hayes did not put his employer on notice of alleged discrimination at the time of his complaint. Hayes first testified at his deposition in 2008 that he told Entenmann that he was "upset," "embarrassed," and felt "humiliated" by Connor. (Def. Rule 56.1 Statement (Doc. No. 82) Ex. A, Pl. Dep. 802.) In his later declaration in 2011, Hayes reported that he was concerned about protecting his employment and wanted Connor to be disciplined for what Hayes perceived as clear racial bias. Hayes also claimed that he told Entenmann that he felt that he had been the victim of racial discrimination, and that he felt like a slave and like Connor was a slave owner. (Hayes Decl. (Doc. No. 89) ¶¶ 49-59.) However, Entenmann's contemporaneous records reflect that Hayes complained merely of feeling humiliated by "the singling out and the unwanted physical contact." (Def. Rule 56.1 Statement (Doc. No. 82) Ex. M). In his 2008 deposition, Hayes reviewed Entenmann's memorandum of Hayes' April 2 complaint, which indicated only that Hayes had reported feeling humiliated. (Def. Rule 56.1 Statement (Doc. No. 82) Ex. A, Pl.

Dep. 810.)  Hayes was asked about the accuracy of that memorandum, and he agreed that it "seem[ed] pretty accurate." (*Id.*)  He testified that, beyond his complaint of feeling humiliated and his desire to no longer report to Connor, "that was pretty much the extent of" what he had said at the April 2 meeting.  (*Id.* at 823.)  Plaintiff cannot raise a genuine issue of fact on a motion for summary judgment by claiming in 2011 that he had originally complained of discriminatory treatment, in contradiction of his 2008 testimony, corroborated by other evidence, that he had complained of feeling upset, embarrassed, and humiliated - a facially race-neutral complaint.  It is well established in the Second Circuit that "a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment." *Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987); *see also Clayborne v. OCE Business Servs.*, 381 Fed. Appx. 32, 35 (2d Cir. 2010) ("Conclusory allegations cannot create a genuine issue of fact, nor may a party create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony.") (internal citations and quotations omitted).

### B.  Causal connection between the complaint and the adverse events

Moreover, plaintiff relies on the short time that elapsed between his April 2 complaint (about Connor's behavior at the March 30 meeting) and his termination on April 27, for the causal connection between them.  (Hoey Decl. (Doc. No. 86) Ex. P.)

"In this Circuit, a plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse [employment] action." *Isaac v. City of New York*, 701 F. Supp. 2d 477 (S.D.N.Y. 2010) (quoting *Gorman-Bakos v. Cornell Co-op. Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir. 2001)) (internal quotation marks omitted); *see also Gorzynski*, 596

F.3d at 110.  However, "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery v. Swiss Reins. Amer. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) (no causal connection when adverse employment actions were part of and resulting from an "extensive period of progressive discipline" beginning well before plaintiff's complaint); *see also Dixon*, No. 09-2839, 2010 U.S. Dist. LEXIS 35348, at *23 (repeated critiques and complaints about plaintiff's management and performance skills made prior to her complaints of discrimination precluded causal connection despite temporal proximity); *Mattera,* 740 F. Supp. 2d at 582 (temporal proximity insufficient to establish causal connection when poor performance reports began a full year before first complaints of discrimination); *Gore*, 2007 U.S. Dist. LEXIS 27993, at *44 ("It is not necessary for an employer to suspend an adverse employment action already in progress upon learning that the employee in question has filed a discrimination complaint.").

Other than the temporal sequence of events, no evidence of causal connection has been offered, and in fact, the sequence of events admitted by plaintiff logically precludes the necessary causal connection.  Plaintiff received a poor performance evaluation in December 2006, and was placed on the PIP in January 2007.  (Def. Rule 56.1 Statement (Doc. No. 82) ¶¶ 35-36, 42, 45.)  He was formally reprimanded for the SPOC incident of March 19, 2007, an incident which defendant does not dispute.  (*Id.* ¶¶ 70, 72-77.)  He had a series of meetings with Connor, to review his progress on the PIP, with unsatisfactory results.  (*Id.* ¶¶ 55, 61-69, 81-86, 99-106, 118-122.)  All of these events preceded his complaint of April 2, 2007.  On the undisputed facts, plaintiff's evidence of retaliation is insufficient to raise a triable issue of fact.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is GRANTED, and all of plaintiff's claims are DISMISSED.  The Clerk of Court is directed to enter judgment accordingly, and to close the file.


SO ORDERED.


Dated: Brooklyn, New York
      March 30, 2012

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
United States District Judge